# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| DIRECT LINK CT, LLC,<br>　　　Plaintiff, | No. 3:17-cv-727 (SRU) |
| v. | |
| FULING PLASTIC USA, INC.,<br>　　　Defendant. | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

This case arose from a dispute over an alleged joint venture between Direct Link CT, LLC ("DLCT") and Fuling Plastic USA, Inc. ("Fuling") to create a commercial entity called Direct Link USA, LLC ("DLUSA"). DLUSA was intended to design and implement a direct sales program to sell in the United States specialty items, including plastic food utensils, made in China. The purported partnership broke down and DLCT filed this case alleging seven causes of action against Fuling: breach of contract (count one); trademark infringement (count two); false designation of origin (count three); misappropriation of trade secrets (count four); interference with business opportunity (count five); breach of fiduciary duty (count six); and CUTPA violations (count seven). *See* Am. Compl., Doc. No. 31. In response, Fuling asserted four counterclaims against DLCT: declaratory judgment of non-infringement of trademark (counterclaim one); cancellation of the trademark registration (counterclaim two); breach of contract (counterclaim three); and unjust enrichment (counterclaim four). *See* Counterclaims, Doc. No. 34. Fuling moved for summary judgment on all of DLCT's claims and all of Fuling's counterclaims. *See* Mem. in Supp. Mot. Summ. J. ("Def. Mem. in Supp."), Doc. No. 40.

At oral argument on April 4, 2019, I granted Fuling's motion with respect to counts two, three, four, five, six, and seven of the Amended Complaint and counterclaim one. *See* Order,

Doc. No. 53. Further, I denied Fuling's motion with respect to counterclaims two, three, and four. *See id.* The only remaining issue, therefore, is Fuling's Motion for Summary Judgment with respect to count one, breach of contract. For the following reasons, Fuling's motion is **granted**.

I.  **Standard of Review**

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment). When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving

2

party submits evidence that is "merely colorable", or is not "significantly probative", summary judgment may be granted. *Anderson*, 477 U.S. at 249–50. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party". *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II.     Background

The allegations here arise from an alleged joint venture between DLCT and Fuling to create the commercial entity DLUSA. Am. Compl., Doc. No. 31 at ¶ 7. Essentially, DLCT alleges that a joint venture was agreed upon and created, and Fuling breached the agreement by

3

terminating the joint venture; Fuling alleges that negotiations broke down before an agreement was reached and, therefore, no joint venture was created.

Fuling was run by its President Xinfu Hu, and DLCT was run by its managing member, Frank Lenge, later along with another member, Tom Melchiorre, who was a "salesperson familiar with the industry." Lenge Depo., Ex. E to Mot. for Summ. J., Doc. No. 41-1 at 44:2-12; Pl. Opp. to 56(a)(1) Stmt of Mat'l Facts, Doc. No. 47 at ¶ 9. In 2009, Hu and Lenge met at a National Restaurant Association trade show and had discussions thereafter about entering into a joint venture. Pl. Opp. to 56(a)(1) Stmt of Mat'l Facts, Doc. No. 47 at ¶ 4-5. In its Amended Complaint, DLCT defined the potential business as one "which included designing and implementing a direct sales program to sell specialty items such as plastic food utensils and cutlery which were to be made in China and in the United States by [Fuling], and were to be sold to the customers in the United States through" DLUSA. Am. Compl., Doc. No. 31 at ¶ 8; Pl. Opp. to 56(a)(1) Stmt of Mat'l Facts, Doc. No. 47 at ¶ 14 ("DLCT would facilitate sales of … plastic cutlery products manufactured by Taizhou Fuling to U.S. customers"). The parties "agreed that Fuling would manufacture, ship and deliver products to customers and DLCT would facilitate the sale, generate the purchase order and invoice [and collect payment from] the customer." Pl. Opp. to 56(a)(1) Stmt of Mat'l Facts, Doc. No. 47 at ¶ 16. DLUSA was formed on December 5, 2011 by Fuling's parent company in China, Taizhou Fuling Plastics Co., Ltd. ("Taizhou Fuling"), in order to "act as a sales agent for Fuling by facilitating the sale and payment of products manufactured by Taizhou Fuling and distributed in the United States." *Id*. DLUSA "served as Fuling's U.S. sales agent" and gave a portion of sales generated to DLCT. *Id.* at ¶ 21.

In February 2011, Lenge sent Hu a written business proposal memorializing the conversations they had about the potential business agreement and Lenge formed DLCT in October 2011 with himself and Melchiorre as the only members. *Id*. at ¶ 6-7, 13; Lenge Depo., Ex. E to Mot. for Summ. J., Doc. No. 41-1 at 205:22-25. In May 2011, Hu, Lenge, and Melchiorre "met to discuss each parties' roles" in DLUSA and in August 2011, the parties "discussed, but never executed" an agreement about DLUSA. Pl. Opp. to 56(a)(1) Stmt of Mat'l Facts, Doc. No. 47 at ¶ 8-10 (Fuling alleges it was a "draft joint venture agreement" that was never executed; DLCT alleges it was a "draft operating agreement for a Delaware [LLC] which was to memorialize the terms of their joint venture agreement" that was never executed).

The parties dispute what occurred next in the formation and implementation of DLUSA. *See* Pl. Opp. to 56(a)(1) Stmt of Mat'l Facts, Doc. No. 47 at ¶ 11-12. DLCT alleges that a joint venture agreement was established in May 2011, when "DLCT and Fuling agreed to initiate all activities of the partners' agreement before final execution of the DLUSA operating agreement" and that, even without the executed agreement, "[s]ales and fulfillment to third parties commenced" and DLCT "began sales of Fuling's products as performance under its agreement with Fuling." *Id*. DLCT alleges that the parties formed this "partners' agreement" in which they "put in place all necessary terms to commence operations" and undertook a joint venture. *Id*. ¶ 22. Further, DLCT alleges that from 2011 through June 2012, the parties, while operating under the valid partners' agreement, "engaged in ongoing negotiations to establish a Delaware [LLC] which would transform the partners' agreement from an entity with significant partner liabilities into an entity which would shield members from liability." *Id*.

Fuling, however, alleges that there was no agreement in May 2011, and that in late 2011 through June 2012, "Fuling and DLCT engaged in ongoing negotiations related to the parties'

5

roles, procedures, and terms of the deal" but, nonetheless, DLCT "began sales efforts of Fuling's products" after the May 2011 meeting. *Id*. at ¶ 11-12. Fuling characterizes the negotiations in 2011 through June 2012 as discussions to create the joint venture and alleges that the parties "exchanged a draft joint venture agreement and drafts of an operating agreement." *Id*. at ¶ 22. Fuling argues that those documents "reflect[ed] several unresolved material terms between Fuling and DLCT" including: sales exclusivity; sales commissions; Fuling's contribution of capital; Fuling's sole control of finances; liability for profits and losses; invoice and payment procedures; Fuling's final approval of sales and payment terms with customers; and trademark rights and uses. *Id*. at ¶ 23. DLCT, however, argues that those ongoing discussions and "open items for resolution" "did not reach or effect the material terms of the then ongoing partners' agreement between Fuling and DLCT." *Id*.

Overall, the parties agree that the operating agreement for DLUSA was never executed. *Id*. at ¶ 26. Fuling alleges, therefore, that there "was never a final joint venture agreement between DLCT and Fuling." *Id*. DLCT alleges, however, that the parties entered into a valid "joint venture partners' agreement" based upon "the significant email and statements and conduct of the parties … pursuant to which the parties operated from more than a year", which established the "material terms and agreement of the partners". *Id*. Further, DLCT claims that "the agreement [was] validated by the Doctrine of Part-Performance in that DLCT relied upon the partners' agreement, fully performed obligations thereunder" and Fuling "unilaterally and wrongfully terminated" the agreement. *Id*.

On June 24, 2012, Hu sent an email to Lenge and Melchiorre in which he stated that DLCT and Fuling were "far better off with a deal rather than a joint venture" and offered to have Melchiorre and Lenge work as "sales people" for DLUSA and receive commissions based upon

6

the sales they individually generated. Termination Letter, Ex. 3 to Am. Compl., Doc. No. 31-3. Fuling interprets the letter as "terminating all negotiations over the potential joint venture", though DLCT interprets that the letter as "terminat[ing] an existing joint venture, not a 'potential' joint venture" and was "clearly … intended to terminate an existing relationship with DLCT." Pl. Opp. to 56(a)(1) Stmt of Mat'l Facts, Doc. No. 47 at ¶ 28. Melchiorre agreed to work as an individual sales representative through his company, TD Melchiorre, Inc., and sold Fuling products on behalf of DLUSA, an agreement that was memorialized in a written Sales Commission Agreement.[1] *Id*. at ¶ 31-32.

DLUSA began handling payments from customers, rather than DLCT.[2] *Id*. at ¶ 44. On July 12, 2012, Fuling and DLCT "publicly severed [ties] by notice to Taizhou Fuling, Fuling, and DLCT's customers" that those entities "would no longer do business with Mr. Lenge or DLCT and that Mr. Lenge and DLCT were no longer authorized to conduct any sales or marketing activities for or on behalf of Fuling and DLUSA." *Id*. at ¶ 51. After the termination of the relationship on July 12, "DLCT effectively ceased any sales on behalf of Fuling", and although Melchiorre continued an independent relationship with Fuling, Lenge did not. *Id*. at ¶¶ 52-53.

DLCT began the present action against Fuling and Hu on May 2, 2017. *See* Compl., Doc. No. 1. DLCT filed the operative Amended Complaint on October 13, 2017, in which it no

---

[1] The "Direct Link" sales model is defined as "a sales system where orders for manufactured products were rolled up and aggregated into large orders to increase sales and create efficiencies by focusing on 'shipping container' sized orders and loads." Pl. Opp. to 56(a)(1) Stmt of Mat'l Facts, Doc. No. 47 at ¶ 33. DLCT did not enter into a confidentiality and/or non-disclosure agreement with Fuling regarding the business model, and potential customers were also not required to sign a confidentiality agreement. *Id*. at ¶¶ 36-37.

[2] Lenge deposited two checks into the DLCT account: (1) on June 29, 2012 for $31,208.00; (2) on July 5, 2012 for $22,337.20. Pl. Opp. to 56(a)(1) Stmt of Mat'l Facts, Doc. No. 47 at ¶¶ 45-46; *see also* Ex. E to Hu Decl., Ex. 5 to Opp. to Mot. for Summ. J., Doc. No. 48-5. Although Fuling characterizes those deposits as "improper", DLCT alleges that the deposits were "lawful and proper" and "in accordance with the partnership practice." Pl. Opp. to 56(a)(1) Stmt of Mat'l Facts, Doc. No. 47 at ¶¶ 45-48. Lenge did not return the money and claims that DLCT was owed that money as a "set off." *Id*. at ¶¶ 49-50.

7

longer asserted claims against Hu. *See* Am. Compl., Doc. No. 31. In its Amended Complaint, DLCT alleges that "the basic terms of the Joint Venture agreement were first negotiated in March 2011" and the parties agreed that DLCT and Fuling would each own 50% of DLUSA. Am. Compl., Doc. No. 31 at ¶ 9. Further, DLCT alleges that at that March 2011 meeting, "the parties agreed that intellectual property would comprise, among other things, patent rights, trade secret rights and trademarks, including protectable rights attaching to the DIRECT LINK® mark." *Id*. at ¶ 11. DLCT alleges that the parties worked together pursuant to the terms of the Joint Venture Agreement and from June 2011 to December 2011, the "Joint Venture achieved approximately $4,000,000 in sales", and from January 1, 2012 to June 25, 2015, "the Joint Venture sold approximately $7,000,000 in revenue." *Id*. at ¶¶ 13-18. DLCT alleges that both the Joint Venture Agreement and the DLUSA Operating Agreement were "valid and binding because of the substantial partial performance" that demonstrated "the intent of both parties" and supported by "numerous emails, writings, and other business communications[.]" *Id*. at ¶¶ 20-22. Moreover, DLCT argues that on June 25, 2012, via email Fuling "unilaterally and without right excluded [DLCT] from all operations conducted by the Joint Venture; and all distributions therefore to the great loss and detriment of" DLCT. *Id*. at ¶¶ 23-24.

DLCT claims that Fuling knew that DLCT was comprised of Lenge and Melchiorre, and Fuling "interfered with the business relationship between [DLCT] and Melchiorre in that it acted in such a manner which would destroy the business relationship that previously existed between Melchiorre and [DLCT.]" *Id*. at ¶¶ 26-27. DLCT alleges that Fuling "contracted with Melchiorre to engage in sales activities which were in direct contravention to the interests of [DLCT] … [and] totally undermined the relationship between Melchiorre and" DLCT." *Id*. at ¶ 28.

In Count One of the Amended Complaint, DLCT alleges breach of contract, claiming that Fuling, Hu, and Melchiorre "colluded and agreed among themselves to exclude [DLCT] from the commercial activities of the [DLUSA] Joint Venture", "engaged in a scheme to withhold material information regarding [DLUSA]", and "withheld regular disbursements owing to [DLCT] based on a 6% commission of gross sales." *Id*. at ¶¶ 49-50. Further, DLCT alleges that Fuling "has continued use of the proprietary DIRECT LINK® trademark in connection with the marketing and sale of plastic cutlery products" and has "exploited confidential trade secret information … includ[ing] Lenge's direct sales process and program as well as customer lists[.]" *Id*. at ¶¶ 51-52. Fuling filed its Answer on November 10, 2018 in which it denied the allegations against it and also asserted counterclaims against DLCT. *See* Answer and Countercl., Doc. No. 34. In it, Fuling alleges that they "engaged in preliminary discussions" with DLCT "regarding a potential joint venture, but no joint venture was ever agreed upon." Countercl., Doc. No. 34 at ¶ 6. Fuling further alleges that the June 25, 2012 letter from Hu to Melchiorre and Lenge "made it clear that there would be no joint venture" and, instead, Fuling "agreed to a commission-based arrangement, whereby [Lenge] and [Melchiorre] would be paid a commission as sales agents selling products manufactured by Fuling." *Id*. at ¶ 7. Fuling terminated the arrangement in July 2012 and "discovered that [Lenge/DLCT] impermissibly deposited two checks belonging to [Fuling] in the amount of $53,545.20 into [DLCT's] own account" and DLCT has failed to return the money, despite demands to do so. *Id*. at ¶¶ 8-10. Further, Fuling alleges that DLUSA was formed in 2011 and Fuling does not sell products "branded with the 'Direct Link' name or logo." *Id*. at ¶ 12.

On December 6, 2018, Fuling moved for summary judgment on all of DLCT's claims against it, as well as all of its counterclaims against DLCT. *See* Mot. for Summ. J., Doc. No. 40;

9

Def. Mem. in Supp., Doc. No. 41. After a hearing on April 4, 2019, the only remaining claim is Fuling's Motion for Summary Judgment on count one of the Amended Complaint for breach of contract.

### III. Discussion

Fuling alleges that it is entitled to summary judgment on DLCT's claim for breach of contract because the record "unequivocally shows that no joint venture existed between the parties" and, at best, "the parties had a commission-based sales agreement." Def. Mem. in Supp., Doc. No. 41 at 17.

"In Connecticut, a breach of contract action requires the plaintiff to show (1) a valid agreement, (2) performance by one party, (3) breach of an agreement by the opposing party and (4) damages directly and proximately caused by the breach." *Censor v. ASC Technologies of Connecticut, LLC*, 900 F. Supp. 2d 181, 193 (D. Conn. 2012) (*citing McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 504 (2006)). "[A]n agreement must be definite and certain as to its terms and requirements…. So long as any essential matters are left open for further consideration, the contract is not complete…. While all the terms of a contract do not need to be present, all the essential terms must have been agreed on." *RIDE, Inc. v. APS Technology, Inc.*, 11 F. Supp. 3d 169, 177 (D. Conn. 2014) (internal citations and quotation marks omitted), *reversed on other grounds*, *RIDE, Inc. v. APS Technology, Inc.*, 612 F. App'x 31, 33 (2d Cir. 2015).

"Under Connecticut law, '[a] joint venture is a special combination of two or more persons who combine their property, money, effects, skill, and knowledge to seek a profit jointly in a single business enterprise without any actual partnership or corporate designation.'" *RIDE, Inc.*, 612 F. App'x at 33 (*quoting Elec. Assocs., Inc. v. Automatic Equip. Dev. Corp.*, 185 Conn.

31 (1981)). Although "a joint venture need not be a separate legal entity, … it requires more than a mere agreement to share profits." *Id*. (internal citations and quotation marks omitted).

There are five elements in order to establish a joint venture: "(1) [T]wo or more persons must enter into a specific agreement to carry on an enterprise for profit, (2) an agreement must evidence their intent to be joint venturers, (3) each must contribute property, financing, skill, knowledge or effort, (4) each must have some degree of joint control over the venture, and (5) there must be a provision for the sharing of both profits and losses." *Id*. at 33-34 (*quoting Censor*, 900 F. Supp. at 201). "Where 'the parties never reached a mutual understanding about such essential terms as the percentage of ownership, allocation of costs and profits, existence of guarantees, management structure, decision-making responsibility, and duration of the joint venture,' a joint venture agreement cannot be formed." *RIDE, Inc.*, 11 F. Supp. 3d at 182 (quoting *Realty Res. Chartered v. The HB Nitkin Grp.*, 2009 WL 2243695, at *9 (D. Conn. July 24, 2009)). "Joint ventures require a manifestation of intent by the parties for them to be associated as joint venturers: '[t]his manifestation of intent need not be explicit, but the parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a simple contract.'" *Id*. (quoting *Zeising v. Kelly*, 152 F. Supp. 2d 335, 348 (S.D.N.Y. 2001). To survive summary judgment, "plaintiffs must come forth with evidence" and "cannot merely make conclusions of law without alleging facts which would bring the case within any of the recognized grounds for that particular cause of action." *Id*. at 183 (internal quotation marks omitted). "The mere fact that the parties met does not evidence creation or continuance of a joint venture relationship." *Id*.

Fuling argues that the "evidence in the record shows that there was no specific joint venture agreement" but that "the parties met to discuss a *potential* joint venture." *Id*. at 18

11

(emphasis added). Further, Fuling argues that from 2011 to June 2012, "Fuling and DLCT engaged in ongoing negotiations related to the parties' roles, procedures, and terms of a deal", and the "parties exchanged a draft joint venture agreement and drafts of an operating agreement", but "did not agree on several material terms of the agreement[.]" *Id*. at 19. Fuling further argues that "[a]fter months of negotiation, it became apparent that the parties would never reach agreement on material terms for a joint venture" and, therefore, Hu sent an email and letter terminating negotiations and proposing a commissions-based sales arrangement instead. *Id*. at 19-20. Fuling argues that "at best, DLCT and Fuling agreed to try to form a joint venture" but there was "no meeting of the minds and no joint venture existed." *Id*. at 20. Because DLCT has not established that there is a question of material fact about the parties entering into a joint venture, Fuling's motion is granted.

Both parties agree that there was no written joint partnership agreement between DLCT and Fuling. DLCT alleges that the contract between it and Fuling was an "Oral Agreement of March 2011, Joint Venture Agreement and Proposed Operating Agreement for [DLUSA] between [DLCT] and Fuling." Resp. to Interrogatory No. 6, Ex. I to Def. Mem. in Supp., Doc. No. 41-1 at 202. DLCT alleges that the parties formed an oral agreement to participate in the joint venture, which was further supported by the parties' performance under the purported agreement. Fuling argues that there was no agreement formed during the parties' meeting and, instead, the parties agreed to negotiate the terms of a future agreement, which ultimately failed, pursuant to Hu's letter terminating negotiations. Overall, Fuling argues that "no joint venture came to fruition" and, instead, "the parties had a commission-based sales arrangement whereby DLCT served, up until July 2012, as sales agent for DLUSA." *Id*. at 23.

12

Lenge testified that he met Hu in 2009 at an industry event and then the two engaged in discussions about a possible partnership over the next year. At some point in 2010, the two met again and Lenge proposed his idea for the Direct Link model (*see* footnote 1), which Hu "love[d]". Lenge Depo. at 58:2-7, Ex. 7 to DLCT's Opp., Doc. No. 48-7 at 59. Lenge testified that he told Hu he would write him "a formal business plan outlining the entire process beginning to end" including the expectations on and responsibilities of both Fuling and DLCT. *Id*. at 58:8-20, Doc. No. 48-7 at 59. Lenge testified that he then put together a "very formal business plan", *id.* at 59:11-12, and sent it to Fuling. *Id*. at 61:4-5, Doc. No. 48-7 at 62. Lenge testified that he and Hu next met in 2011 and made an "arrangement agreement to form the new company called [DLUSA] … of which Fuling … would be a 50 percent owner, and [DLCT] would be a 50 percent owner." Lenge Depo at 65:3-7, Ex. E to Def. Mem. in Supp., Doc. No. 41-1 at 123. Lenge testified that there was an agreement made to form DLUSA at that meeting, that he and Hu "sat at a table", "discussed the whole business plan", "both agreed to it", and "shook hands and said let's do it." *Id*. at 69:7-10, Doc. No. 41-1 at 124. He further testified that he drafted a business plan and when he and Hu had their first meeting they "shook hands" and said "let's execute this thing and get it going." *Id*. at 206:10-12; Doc. No. 41-1 at 156. Lenge also testified that they discussed "doing a 50/50 partnership" and "shook hands on it." *Id*. at 206:14-16, Doc. No. 41-1 at 156. Lenge testified that he believed the parties "had an arrangement and an agreement" and, therefore, did not ask for Hu to sign a nondisclosure agreement. *Id*. at 206:18-20. Moreover, Lenge testified that at the meeting, Hu told Lenge to have his attorney "write up the details of what [they were] talking about." *Id*. at 69:10-13, Doc. No. 41-1 at 124 (acknowledging that there was no written agreement). Lenge also acknowledged

13

that neither he nor Hu ever signed a final document memorializing their purported agreement. *Id.* at 73:4-6, Doc. No. 41-1 at 125.

Lenge also testified that at some point between March and May of 2011, he and Hu met, this time also with Melchiorre, and the parties "discussed execution of sales" and discussed "the business plan which laid out in detail what Fuling would do and what Direct Link would do." *Id.* at 74:9-14, Doc. No. 41-1 at 126. At some point in 2011, Lenge sent an email with the "working draft of the joint venture agreement", which he testified was not the original draft because the original draft had Fuling and DLCT each as 50 percent owners of DLUSA, which was later changed to 49 percent for DLCT and 51 percent for Fuling. Lenge Depo. at 77:19-79:16, Ex. 7 to DLCT's Opp, Doc. No. 48-7 at 78-80. Lenge testified that DLCT and Fuling had agreed to a compensation structure that DLCT would receive 8% of sales. Lenge Depo. at 114:8-18, Ex. E to Def. Mem. in Supp., Doc. No. 41-1 at 135. Lenge described the process as follows: Fuling would "manufacture, ship, and deliver to customers", and DLCT would "get the sale, which would generate a [purchase order], which would facilitate manufacturing the order" and once the order was delivered, DLCT would "generate an invoice to the customer" and, when it was paid, DLCT would cash the check and "wire back the amount of the invoice [to Fuling] minus the agreed upon compensation for" DLCT. *Id.* at 135:4-12, Doc. No. 41-1 at 143.

Lenge also testified that at some point throughout the process, the parties exchanged drafts of the agreement in which there was a dispute between the parties relating to "the percentage of company ownership." *Id.* at 146:5-13, Doc. No. 41-1 at 146. Lenge also testified that, although the draft versions of the operating agreement provided for a commissions-based payment structure, the parties never agreed to commissions. Lenge Depo. at 178:19-179:13, Ex. 7 to DLCT Opp., Doc. No. 48-7 at 180.

Even when viewing the evidence in the light most favorable to DLCT, the record does not support a conclusion that the parties ever "reached a mutual understanding about … essential terms" of an agreement that would be necessary in order to form a contract. *RIDE, Inc.*, 11 F. Supp. 3d at 182. Because the parties agree that there was never a formalized written contract, DLCT must rely on the purported "handshake" and oral agreements that it alleges the parties entered into. Lenge's own testimony establishes that "[a]t best, the parties can be said to have agreed to try to form a joint venture", *Realty Res.*, 2009 WL 2243695 at *7, because Lenge acknowledged that Hu asked him to have his lawyer draft up an agreement for them to discuss. The evidence further shows that the documents that were circulated were drafts and were still being edited and negotiated well after the purported "handshake agreement." *See* Ex. 1 to Am. Compl., Doc. No. 31-1 (draft joint venture agreement dated August 2011); Ex. 2 to Am. Compl., Doc. No. 31-2 (edited draft operating agreement). In a February 2011 email to Fuling, Lenge attached a document which he called the "Direct Link *Proposal*" and describes the proposal as "just a basic working outline of the Direct Link™ concept and a *starting point* for both of us to build on." Email Chain, Ex. K to Def. Mem. in Supp., Doc. No. 41-1 at 216-21 (emphasis added).

It is undisputed that Fuling and DLCT were working together in some capacity throughout the duration of the negotiations surrounding the joint venture, but the evidence does not support DLCT's contention that the parties were working together under a joint venture agreement that was fully formed with all the essential terms assented to by both parties. It is well-established that "an agreement to agree does not give rise to a contractual relationship." *Realty Res.*, 2009 WL 2243695 at *7. The evidence establishes that, at most, the parties entered into precisely that: an agreement to agree in the future. The parties were still negotiating

15

essential terms of the contract such as the percentage of ownership (at first the parties discussed 50/50 but then later discussed 49/51); the payment structure (although the draft agreements considered the payments "commissions", Lenge testified that he never agreed to be a commissioned salesperson). There is also no evidence to suggest that the parties, at the purported "handshake agreement" meeting, ever discussed the allocation of costs and profits, the existence of guarantees, management structure, decision-making responsibility, or the duration of the joint venture. Without evidence of a "mutual understanding" about those essential terms, "a joint venture cannot be formed." *RIDE, Inc.*, 11 F. Supp. 3d at 182.

Accordingly, DLCT has not established that there is a question of material fact about whether the parties entered into a joint venture. The undisputed evidence shows that there were numerous essential terms still left undiscussed and/or undecided and, therefore, a joint venture was not formed. Because there was no joint venture established, Hu, in his July 2012 letter, terminated negotiations for a potential joint venture, not the venture itself. There was, therefore, no contract to breach and Fuling is entitled to summary judgment on Count One of the Amended Complaint.

## IV. Conclusion

Fuling's Motion for Summary Judgment on count one, breach of contract, is **granted.**

So ordered.

Dated at Bridgeport, Connecticut, this 9th day of August 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

16